UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| JAIMIE TRICKEY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:13-cv-00124 ) Judge Haynes/Brown |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) ) |
| Defendant. | ) |

**To: The Honorable William J. Haynes, Chief United States District Judge**

### REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks review of the Social Security Administration Commissioner's decision denying Plaintiff's application for period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"). For the foregoing reasons, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record (DE 16)[1] be **DENIED** and the Commissioner's decision be **AFFIRMED**.

### I. PROCEDURAL HISTORY

Plaintiff filed for period of disability and DIB on February 9, 2011, alleging an onset date of September 1, 2005, due to her Ehlers-Danlos Syndrome,[2] hip pain, arthritis, ligament pain, and difficulty walking and sitting. (DE 14, pp. 59, 66, 101-102).[3] She was initially denied

---

[1] "DE" refers to Docket Entry.
[2] "[A] group of inherited disorders of the connective tissue . . . . The major manifestations include hyperextensible skin and joints, easy bruisability, friability of tissues with bleeding and poor wound healing, calcified subcutaneous spheroids, and pseudotumors." Dorland's Illustrated Medical Dictionary 1828 (32nd ed. 2012).
[3] Page citations to the Administrative Record (DE 14) refer to the black number in the bottom right corner of each page.

benefits in June 2011 and upon reconsideration in July 2011. (DE 14, pp. 59-60, 63-66, 68-70). Plaintiff testified before an administrative law judge ("ALJ") at an administrative hearing on April 25, 2012. (DE 14, p. 26). The ALJ issued an unfavorable decision on July 12, 2012, based on the following findings of fact and conclusions of law:

(1) The claimant last met the insured status requirements of the Act on December 31, 2010.

(2) The claimant did not engage in substantial gainful activity ("SGA") during the period from her alleged onset date of September 1, 2005 through her date last insured of December 31, 2010.

(3) Through the date last insured, the claimant had the following severe impairments: joint hypermobility/Ehlers-Danlos Syndrome and myalgias.[4]

(4) Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(5) After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity ("RFC") to perform a range of sedentary work as defined in 20 C.F.R. § 404.1567(a). She could lift up to ten pounds occasionally and frequently. She could stand and walk for up to two hours and sit for up to six hours in an eight-hour day with normal breaks. She could occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds. She could occasionally balance, stoop, kneel, crouch, or crawl. She must avoid even moderate exposure to extreme cold or heat and may not use vibrating hand tools or be exposed to excessive vibration. She must avoid concentrated exposure to the operational control of moving and hazardous machinery and unprotected heights.

(6) Through the date last insured, the claimant was capable of performing past relevant work as a receptionist, DOT 237.367-038, a sedentary and semi-skilled occupation, and office manager, DOT 169.167-034, a sedentary and skilled occupation. This work did not require the performance of work-related activities precluded by the claimant's RFC.

(7) The claimant was not under a disability, as defined in the Act, at any time from September 1, 2005, the alleged onset date, through December 31, 2010, the date last insured.

---

[4] "[P]ain in a muscle or muscles." Dorland's Illustrated Medical Dictionary 1214 (32nd ed. 2012).

(DE 14, p. 12). On September 19, 2013, the Appeals Counsel declined to review the ALJ's decision. (DE 14, p. 1). On October 9, 2013, Plaintiff filed a complaint against the Social Security Administration. (DE 1). Defendant answered the complaint and filed the administrative record on January 22, 2014. (DE 13, 14). Plaintiff then moved for judgment on the administrative record on February 21, 2014. (DE 16, 17). Defendant responded to this motion on March 24, 2012. (DE 18). The matter is properly before the Court.

## II. REVIEW OF THE RECORD

### A. MEDICAL EVIDENCE

#### 1. Baptist Hospital

Plaintiff was treated at the Baptist Hospital from April 2005 to March 2007. (DE 14, pp. 181-248). On April 15, 2005, Plaintiff underwent surgery on both of her eyelids. (DE 14, pp. 237-245). She was admitted with a chemical burn on her foot on March 9, 2007 after attempting to self-remove a tattoo. (DE 14, pp. 192-236).

#### 2. Williamson Medical Center

On June 14, 2009, Plaintiff was treated at the Williamson Medical Clinic for sinusitis, bronchitis, and asthma exacerbation. (DE 14, pp. 254-255). Plaintiff was later admitted on October 17, 2010 for leg swelling and pain. (DE 14, p. 249). Dr. Enrique Arevalos, M.D., performed a US Unilateral Venous Duplex Doppler on Plaintiff's legs, finding no deep venous thrombus,[5] no superficial venous thrombus, and no soft tissue abnormalities. (DE 14, p. 253).

#### 3. Dr. Sheila Schuler, DPM[6]

From 2002 to 2010, Dr. Schuler treated Plaintiff's podiatric problems. (DE 14, pp. 259-263). During this time, Dr. Schuler ordered orthotics for Plaintiff. (DE 14, p. 259). In 2006,

---

[5] Thrombus is defined as "a stationary blood clot along the wall of a blood vessel, frequently causing vascular obstruction." *Id.* at 1923.
[6] Doctor of Podiatric Medicine

Plaintiff reported that some of the shoes felt good. (DE 14, p. 261). She reported discomfort and pain during the appointments, but Dr. Schuler noted no fractures, edema,[7] or erythema.[8] (DE 14, pp. 261-263). In October 2010, Dr. Schuler noted mild edema and tenderness from Plaintiff's left knee to ankle but that Plaintiff walked with a normal gait. (DE 14, p. 263).

### 4. Elite Sports Medicine and Orthopaedic Center

On November 8, 2010, Plaintiff was treated at Elite Sports Medicine and Orthopaedic Center for knee aches. (DE 14, p. 264). Both of Plaintiff's knees had mild patellar femoral joint crepitation, and Plaintiff's left knee had moderate posterior medial joint line tenderness. (DE 14, p. 268). The range of motion in Plaintiff's right knee had a passive flexion of 130 degrees and was accompanied by pain. (DE 14, p. 268). She had a negative McMurray's test, a negative patellar compression test, and a negative patellar apprehension test. (DE 14, p. 269). X-rays of her knees only showed mild lateral patellar tilt bilaterally. (DE 14, p. 269). Plaintiff was again treated on November 9, 2010. (DE 14, p. 274). MRIs from this visit showed marrow edema but no ligament or meniscal tears in Plaintiff's knees, L4-L5 facet arthrosis and degenerative disc disease with minimal foraminal stenosis in Plaintiff's lumbar spine, and mild degenerative changes, edema, and tendinosis of the hips. (DE 14, pp. 300-303). It was also noted that Plaintiff's lumbar extension was moderately restricted. (DE 14, p. 274). In a follow-up appointment on November 18, 2010, Dr. Chris Glattes, M.D., reported that an MRI of Plaintiff's lumbar spine showed L4-L5 arthritis, stenosis with associated synovial cyst. (DE 14, p. 278). On December 7, 2010, Dr. David Moore, M.D., noted that Plaintiff's X-rays demonstrated well-maintained medial, lateral, and patellofemoral compartment joint spaces and her MRIs demonstrated a moderate sized bone bruise on her left leg and a moderate sized chondral fissure

---

[7] "[T]he presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body." Dorland's Illustrated Medical Dictionary 593 (32nd ed. 2012).
[8] "[R]edness of the skin produced by congestion of the capillaries." *Id.* at 643.

to her patella on the right leg. (DE 14, pp. 283-284). On November 30, 2010, Dr. John Dalton, M.D., performed a L4-5 interlaminar epidural steroid injection on Plaintiff. (DE 14, p. 305).

Dr. Glattes opined on December 16, 2010, that Plaintiff had persistent radiculitis.[9] (DE 14, p. 286). Dr. Wallace Friedman, M.D., performed a right-sided L5-S1 transforaminal epidural steroid injection on Plaintiff on December 23, 2010. (DE 14, p. 307). On January 27, 2011, Dr. Glattes again diagnosed Plaintiff with lumbar radiculopathy. (DE 14, p. 290). An MRI of Plaintiff's cervical spine during this visit showed minor degenerative changes at C4-5 and C5-6 without central canal stenosis or neural displacement or encroachment and minimal depression in the superior endplates of T2 and T3 likely representing old compression fractures. (DE 14, p. 304).

### 5. Heritage Medical Associates, P.C. – Dr. Larry Pharris, M.D.

Plaintiff complained of cellulitis in her lower right extremity on March 11, 2007, after being treated for her tattoo self-removal injury. (DE 14, p. 414). Dr. Pharris treated Plaintiff on August 3, 2007 for muscle pain, among other complaints. (DE 14, p. 406). Plaintiff saw Dr. Pharris on March 13, 2008 regarding her neck pain which arose after she fell off a couch. (DE 14, p. 399). On April 16, 2008, Dr. Stanley Hopp, M.D., from the Tennessee Orthopaedic Alliance saw Plaintiff for neck pain at Dr. Pharris' referral. (DE 14, p. 394). He opined that Plaintiff had a history of cervical sprain, recent cervical sprain, cervicalgia, no objective radiculopathy, and a history of TMJ problems. (DE 14, p. 395).

Plaintiff complained of muscle and back pain in October 2008 through October 2009. (DE 14, pp. 363-388). On October 21, 2009, Plaintiff was treated at the American College of Rheumatology at Dr. Pharris' referral. (DE 14, p. 351). Rheumatology consultant Dr. Christian Rhea, D.O., noted that Plaintiff's AC shoulder joint was enlarged but that he was uncertain of the

---

[9] "[I]nflammation of the root of a spinal nerve." *Id.* at 1571.

etiology of Plaintiff's shoulder pain and that his exam did not show signs of systemic inflammatory or connective tissue disease. (DE 14, pp. 355-359). Labs taken that day were negative for rheumatoid arthritis or any increased inflammation, and X-rays of Plaintiff's shoulder were normal aside from mild hypertrophic spurring. (DE 14, pp. 360-361). Plaintiff saw Dr. Pharris on October 9, 2009 regarding her left shoulder pain. (DE 14, p. 362).

Dr. Pharris treated Plaintiff on April 9, 2010 for anxiety, depression, esophageal reflux, and back pain. (DE 14, pp. 336-339). On October 8, 2010, Plaintiff visited Dr. Pharris, complaining of gerd. (DE 14, p. 329). Dr. Pharris noted that Plaintiff was fatigued and had muscular pain. (DE 14, p. 330). Dr. William Edwards, M.D., from The Surgical Clinic, PLLC, corresponded with Dr. Pharris on November 8, 2010, noting that Plaintiff's examination did not show evidence of deep venous reflux or deep venous thrombosis, her leg size was equal, and she was quite tender but her claimed impairment was not venous in nature. (DE 14, pp. 325, 487-489). Dr. Edwards referred Plaintiff to Dr. Pharris to consider collagen vascular disease or other autoimmune inflammatory process. (DE 14, p. 325). On November 9, 2010, Plaintiff saw Dr. Pharris for leg pain and joint pain. (DE 14, pp. 320-322). Plaintiff's ANA Screen[10] was negative. (DE 14, p. 323). Dr. Pharris treated Plaintiff on December 10, 2010. (DE 14, p. 317). She primarily complained of edema, or swelling, in her hands and legs. (DE 14, p. 317). Dr. Pharris noted trace edema on her left extremity, but no edema on the right. (DE 14, p. 318).

Plaintiff's echocardiogram dated May 4, 2011, showed overall normal findings. (DE 14, pp. 423-424). On April 25, 2011, Dr. Paul Fleser, M.D. from Middle Tennessee Vascular wrote to Dr. Pharris, stating that Plaintiff had venous reflux in her left leg with saphenous vein insufficiency and recommended she undergo endovenous laser ablation to treat the venous insufficiency symptoms. (DE 14, p. 426). In March 2011, Plaintiff reported to Dr. Robert

---

[10] Antinuclear antibody test

Cochran, M.D., that after switching to Lortab to Oxycodone she had pretty good control of her pain except in her right hip, she was happier and less distracted, and she was able to complete tasks. (DE 14, p. 434).

**6. Vanderbilt Medical Group Franklin Rheumatology Clinic – Dr. James Gore, M.D.**

Dr. Gore first treated Plaintiff at the Vanderbilt Medical Group Franklin Rheumatology Clinic on December 28, 2010. (DE 14, p. 315). Dr. Pharris had referred Plaintiff for treatment of her joint pain and right leg swelling. (DE 14, p. 483). Views of Plaintiff's left ankle and left tibia-fibula were normal. (DE 14, p. 475). During the visit, Dr. Gore discussed Ehlers-Danlos Syndrome with Plaintiff and recommended she have an echocardiogram during her annual exam. (DE 14, p. 477). He next treated Plaintiff on January 13, 2011. (DE 14, p. 312). On February 1, 2011, Dr. Gore noted no swollen joints and diffusely tender joints especially in her right lateral hip. (DE 14, p. 309). He gave her medication for her myalgias and hypermobility[11] and referred her to an orthopedist for her right hip pain. (DE 14, p. 309).

On June 23, 2011, Dr. Gore noted that Plaintiff's hip pain was lessened by applying ice and Voltaren gel. (DE 14, p. 464). She was taking Cymbalta and Tramadol for her myalgias and hypermobility. (DE 14, p. 464). Plaintiff again saw Dr. Gore on March 8, 2012. (DE 14, pp. 511-512). He additionally provided a medical source statement dated April 10, 2012. (DE 14, pp. 513-514). According to Dr. Gore, the symptoms of joint and muscle pain and fatigue from Plaintiff's Ehlers-Danlos Syndrome constantly interfered with her attention and concentration. (DE 14, p. 513). Her medication caused an upset stomach and fatigue. (DE 14, p. 513). Plaintiff would need to take more breaks than the typical work-day breaks. (DE 14, p. 513). He did not perform a functional capacity assessment for Plaintiff, but stated that Plaintiff has chronic,

---

[11] "[G]reater than normal range of motion in a joint, which may occur naturally in otherwise normal persons or may be a sign of joint instability." Dorland's Illustrated Medical Dictionary 892 (32nd ed. 2012).

constant pain when sitting or standing for prolonged periods. (DE 14, p. 514). She would need to miss work more than four times per month, her average level of pain was nine out of ten, and she had an incurable disease. (DE 14, p. 514).

### 7. Dr. Robert Cochran, M.D.

Plaintiff saw Dr. Cochran from February 2011 to May 2012. (DE 14, pp. 492-509). Dr. Cochran did not perceive psychiatric illnesses aside from depression. (DE 14, p. 505). In October 2011, Plaintiff told Dr. Cochran that taking Oxycodone restored her poor memory and focus. (DE 14, p. 502). Plaintiff reported that she still had difficulty completing tasks and requested Adderall. (DE 14, p. 502).[12]

## B. CONSULTATIVE ASSESSMENTS

### 1. Psychiatric Review Technique – Dr. Brad Williams, M.D.

On May 18, 2011, Dr. Williams reported that there was insufficient evidence with which to complete Plaintiff's psychiatric review technique. (DE 14, p. 443).

### 2. Physical RFC Assessment – DDS Examiner L. Shaffzin

L. Schaffzin completed a physical RFC assessment for Plaintiff on June 14, 2011. (DE 14, pp. 456-463). According to the examiner, Plaintiff could occasionally and frequently lift ten pounds, stand or walk for six hours in an eight-hour day, sit for six hours in an eight-hour day, and had no other limits. (DE 14, pp. 457-460).

## C. PLAINTIFF'S TESTIMONY

At the beginning of the hearing, Plaintiff's attorney requested the onset date be moved from September 1, 2005, to October 21, 2009. (DE 14, p. 29). The ALJ agreed. (DE 14, p. 29). When asked why she selected October 21, 2009, Plaintiff stated that her knees and back were bothering her and that she had vascular issues with her legs at that time. (DE 14, p. 37).

---

[12] The record contains additional notes from Dr. Cochran, but they are illegible.

Plaintiff testified that she has a bachelor's degree and a paralegal degree. (DE 14, p. 31). She has a driver's license and drives when needed. (DE 14, p. 32). Due to her pain and impairments, she stays home, and her husband takes her to doctor's appointments. (DE 14, p. 32). She previously worked as a receptionist and an office manager from 2000 to 2005, as a receptionist for the prior eight years, and as a clerical person before that. (DE 14, p. 33). She testified that the side effects from her medications do not limit her ability to function during the day. (DE 14, pp. 33–34). She managed her pain with oxycodone gel, a TENS[13] machine, physical therapy, using heat and ice, elevating her legs with a pillow, TEDs hose,[14] knee braces, silver rings on her hands, and special shoes. (DE 14, pp. 34-36). Plaintiff stated that Dr. Gore and Dr. Jane Sigel recommended the finger rings. (DE 14, p. 36). A physical therapist recommended the TENS unit. (DE 14, p. 38).

According to Plaintiff, she first saw Dr. Gore on December 28, 2010. (DE 14, p. 37). He was the first person to diagnose Plaintiff with Ehlers-Danlos Syndrome. (DE 14, p. 37). She was previously treated by Dr. Pharris from 2009 to December 2010. (DE 14, p. 37). Even with her medications, she stated her pain was still a nine out of ten, the worst pain being in her knees, back, and right hip. (DE 14, p. 38). Before Plaintiff began seeing Dr. Gore, her daily activities on a good day included gardening, staining glass, and making jewelry. (DE 14, p. 39). During 2009 and late 2010, Plaintiff stated her husband helped her with laundry, dressing, grocery shopping, and a majority of the housework. (DE 14, pp. 39-40). In that time period, her neck, back, left shoulder, and hip were bothering her. (DE 14, p. 42). Before seeing Dr. Gore, the heaviest thing she lifted was a gallon of milk. (DE 14, p. 41).

---

[13] Transcutaneous Electrical Nerve Stimulation
[14] Also referred to as compression stockings

Plaintiff testified that her syndrome changed the type of clothing she can wear; pain in her left leg makes it feel like her leg is going to burst; she is no longer active; and she cannot pursue her hobbies. (DE 14, p. 43). She saw Dr. Edwards, a vascular surgeon, because her leg was swelling and in constant pain. (DE 14, p. 44). She also alleged that her disorder resulted in TMJ issues. (DE 14, pp. 44-45). Plaintiff wears permanent retainers to treat the TMJ. (DE 14, p. 45). She also claimed that she bruises easily and takes longer to heal than usual. (DE 14, p. 45). In March 2011, Plaintiff saw Dr. Cochran for pain management. (DE 14, pp. 45-46). She also saw Dr. Elrod from Elite Sports Medicine for pain in her knees and back. (DE 14, pp. 46-48). In 2009, Plaintiff testified, over half of each month consisted of "bad days" in which she sat on the sofa, elevated her legs, and watched television. (DE 14, p. 46). She stated that she elevated her legs several times a day, three hours total in an eight-hour day. (DE 14, p. 47). Dr. Fleser with Middle Tennessee Vascular performed vascular surgery on Plaintiff, but the medical record provided did not contain the operative report. (DE 14, pp. 48-49).

### D. VOCATIONAL EXPERT'S TESTIMONY

The Vocational Expert ("VE") testified that Plaintiff previously worked as a receptionist[15] (sedentary, SVP 4,[16] semi-skilled) and as an office manager[17] (sedentary, SVP 7, skilled with transferrable clerical skills). (DE 14, p. 51). According to the VE, a younger individual with greater than a high school education, work experience similar to Plaintiff's, who could lift up to twenty pounds occasionally and ten pounds frequently, stand, walk, and sit for up to six hours in an eight-hour day with normal breaks, occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, occasionally balance, stoop, kneel, crouch, and crawl, and

---

[15] DOT 237.367-038
[16] Specific Vocational Preparation
[17] DOT 169.167-034

should avoid concentrated exposure to work place hazards could perform all of Plaintiff's previous occupations. (DE 14, pp. 51-52).

If the first hypothetical was changed to an individual who could lift up to ten pounds occasionally and frequently, stand and walk for two hours and sit for six hours in an eight-hour day with normal breaks, with the same postural limitations as previously stated, the individual could still perform Plaintiff's past work. (DE 14, p. 52).

Further restricting the second hypothetical, if the individual needed to avoid moderate exposure to extreme cold or extreme heat and could not use vibrating or moving hand tools, the individual would still be able to perform Plaintiff's past occupations. (DE 14, p. 53).

Taking the third hypothetical and further limiting the individual to only occasional bilateral hand use for handling and fingering objects, the VE testified that the individual could not perform Plaintiff's past work but could still perform the occupations of an operator[18] (sedentary, SVP 2, unskilled) and a surveillance monitor[19] (SVP 2, unskilled). (DE 14, p. 54). An individual who needed to miss work up to five to ten days per month could not sustain competitive employment. (DE 14, p. 55).

In response to the attorney's questioning, the VE testified that an individual would not be able to perform Plaintiff's past work or other work if the individual's impairments constantly interfered with her ability to concentrate and perform simple work related tasks. (DE 14, p. 56). An individual who needed to elevate her legs for a couple of hours a day, several days a week, would likewise be unable to sustain a job. (DE 14, p. 56).

### III. CONCLUSIONS OF LAW

#### A. STANDARD OF REVIEW

---

[18] DOT 237.367-014
[19] DOT 379.367-010

This Court reviews the record to determine whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ made those findings in accordance with the correct legal standards. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). "Substantial evidence is less than a preponderance but more than a scintilla." *Id.* The ALJ's decision shall be upheld if the evidence in the record is such that a "reasonable mind might accept [it] as adequate to support a conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013), *reh'g denied* (May 2, 2013). This is true even when substantial evidence favors an opposite conclusion. *Id.* Failure to follow the proper legal standards implies a lack of substantial evidence. *Id.*

## B. PROCEEDINGS AT THE ADMINISTRATIVE LEVEL

A claimant is "disabled" within the meaning of the Act if an extended medically determinable physical or mental impairment prevents her from engaging in SGA. 42 U.S.C. §§ 416(i); 423(d). Disability is assessed under a five-step test:

(1) If the claimant is engaged in SGA, the claimant is not disabled.

(2) If the claimant's physical or mental impairment, or combination of impairments, is not severe or does not meet the duration requirement, the claimant is not disabled.

(3) If the claimant's impairment(s) meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart. P, Appendix 1, the claimant is presumed disabled, and the inquiry ends.

(4) Based on the claimant's RFC, if the claimant can still perform past relevant work, the claimant is not disabled.

(5) If the claimant's RFC, age, education, and work experience indicate that the claimant can perform other work, the claimant is not disabled.

20 C.F.R. § 404.1520(a)(4). From step one through step four, the burden of proof is on the claimant. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). At step five, the burden shifts to the Commissioner, who may meet this burden by "identify[ing a] significant

number of jobs in the economy that accommodate the claimant's [RFC] and vocational profile."
*Id.*

## C. PLAINTIFF'S STATEMENT OF ERRORS

Plaintiff claims (1) the ALJ should have given Dr. Gore's opinions controlling weight, (2) the ALJ considered the wrong onset date,[20] and (3) Plaintiff's RFC should have included the requirement that Plaintiff elevate her legs during the workday. (DE 17).

### 1. The ALJ Gave Appropriate Weight to Dr. Gore's Opinion

According to Plaintiff, the ALJ should have given controlling weight to Dr. Gore's medical source statement. (DE 17, pp. 7-8). Defendant claims the ALJ did not err in giving little weight to Dr. Gore's opinion because it was provided more than fifteen months after Plaintiff's insured status expired. (DE 18, pp. 1, 5). Dr. Gore first treated Plaintiff on December 28, 2010; Plaintiff's insured status expired on December 31, 2010; and Dr. Gore provided the medical source statement on April 10, 2012.

To receive DIB payments, Plaintiff must prove she was disabled before her insured status expired. *See* 42 U.S.C. § 423(a) and (c); *Perschka v. Comm'r of Soc. Sec.*, 411 F. App'x 781, 786 (6th Cir. 2010); *Hamilton v. Apfel*, 178 F.3d 1294 (6th Cir. 1999). Evidence arising after the claimant's insured status lapsed may be considered to the extent that it "relates back" and indicates whether the claimant was disabled before her insurance expired. *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003) (citing *King v. Sec'y of Health and Human Servs.*, 896 F.2d 204, 205–06 (6th Cir. 1990)); *Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452, at *1 (6th Cir. 1999). If the post-expiration evidence does not establish the claimant was disabled prior

---

[20] Plaintiff's memorandum concludes with a "Summary" section. (DE 17, p. 10). It restates the first and third claims of error regarding the weight given to Dr. Gore's opinion and the leg elevation restriction. The summary for the second claim of error appears to present a new credibility argument which is not clearly set forth in the "Statement of Errors" section of the memorandum. Absent law and argument supporting the credibility claim, it is presumed that Plaintiff intended to pursue the more fully briefed second claim of error regarding the incorrect date of onset.

to her insured status expiring, the evidence presents little probative value. *Perschka*, 411 F. App'x at 787 (citing *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990)); *Nagle*, 191 F.3d at *1; *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).

Aside from providing the citation to the weight owed to treating physicians' opinions, Plaintiff did not provide other authority suggesting that Dr. Gore's post-insured opinion should relate back to the relevant time period. This medical source statement, noted the ALJ, "appears to address her current condition" and "was written nearly sixteen months after he date last insured and is thus given little weight." (DE 14, p. 21). Most importantly, the medical source statement did not purport to "address[] the relevant period," referring to the alleged onset of disability to the date of late insured. (DE 14, p. 21). Aside from stating the Plaintiff suffers from Ehlers-Danlos Syndrome, an incurable disease, the medical source statement provides no indication that the limitations therein described are comparable to Plaintiff's pre-expiration limitations. The ALJ did not err in assigning little weight to this medical source statement.

### 2. The ALJ Committed Harmless Error by Using the Incorrect Onset Date

Plaintiff next claims the ALJ erred by using September 1, 2005 as the onset date of disability because Plaintiff had amended the onset date during the administrative hearing to October 21, 2009. (DE 17, p. 8). The medical records after October 21, 2009, according to Plaintiff, are more pertinent to her disability claim.

According to SSR 83-20, "[t]he onset date of disability is the first day an individual is disabled as defined in the Act and the regulations." 1983 WL 31249, at *1 (Jan. 1, 1983). A claimant alleging disability of nontraumatic origin may amend the alleged onset date during a hearing or in writing. *Id.* When Plaintiff first applied for benefits, she listed the onset date as September 1, 2005. (DE 14, p. 66). During the administrative hearing, the ALJ permitted her to

amend her date of onset to October 21, 2009. (DE 14, p. 29). In the ALJ's decision, however, September 1, 2005 is consistently referred to as the date of onset, and the ALJ discussed medical records prior to the amended date of onset. (DE 14, pp. 17-21).

This type of oversight normally does not warrant a remand unless the claimant can prove that the ALJ's error caused her prejudice. *Wallace v. Colvin*, 2:11-0100, 2014 WL 2117500, at *10 (M.D. Tenn. May 21, 2014) *report and recommendation adopted*, 2:11-CV-00100, 2014 WL 2700956 (M.D. Tenn. June 12, 2014); *Baskin v. Colvin*, 3:11-0948, 2013 WL 1149597, at *13 n.24 (M.D. Tenn. Mar. 19, 2013) *report and recommendation adopted*, 3:11-CV-0948, 2013 WL 1405962 (M.D. Tenn. Apr. 8, 2013) ("The general rule appears to be that, absent a showing of prejudice, 'an error in the alleged onset of disability is not itself a basis for remand.'") (quoting *Ehrob v. Comm'r of Soc. Sec.*, CIV. 09-13732, 2011 WL 977514, at *6 (E.D. Mich. Mar. 17, 2011)); *Jackson v. Comm'r of Soc. Sec.*, 3:11-CV-358, 2012 WL 5497778, at *4–5 (S.D. Ohio Nov. 13, 2012) *report and recommendation adopted*, 3:11-CV-358, 2012 WL 6015889 (S.D. Ohio Dec. 3, 2012) (noting that even though the ALJ used an incorrect onset date, the claimant failed to show why this misidentification required reversal or remand).

While Plaintiff claims that the medical records after October 21, 2009 are "much more pertinent to the claim" (DE 17, p. 8), this does not necessarily mean that considering earlier evidence was prejudicial. The ALJ thoroughly considered and addressed the post-2009 medical evidence (DE 14, pp. 19-21), and the ALJ's credibility analysis takes into account Plaintiff's post-2009 activities which included making sterling silver jewelry with an acetylene torch in 2009, 2010, and 2011. (DE 14, pp. 17, 39). Substantial evidence supports the ALJ's decision, and the ALJ's oversight regarding the date of onset was harmless.

3. **Plaintiff's RFC Does Not Include Leg Elevation Requirements**

Plaintiff further claims she needs to elevate her legs during the day, and this requirement would preclude her from working. (DE 17, p. 9). Although she provides no legal authority for this argument, it appears she is challenging the ALJ's RFC assessment. She points to two sections of the record in support of her contention. First, she references Dr. Gore's medical record dated December 28, 2010. (DE 14, p. 315).[21] This record is from Plaintiff's first visit with Dr. Gore and Plaintiff's only visit with Dr. Gore before her insured status expired. In summarizing Plaintiff's medical history, Dr. Gore noted that "She now has episodes of swelling and discomfort about 1-2 times per week. It is achy, moderate, with overuse, but improved with rest, elevation, and taking Mobic." (DE 14, p. 315). Dr. Gore made the same statement on January 13, 2011, the month after Plaintiff's insured status expired. (DE 14, p. 312). Second, Plaintiff refers to the VE's testimony in response to a hypothetical posed by her attorney, not by the ALJ, during the administrative hearing. (DE 14, p. 60). According to the VE, an individual who needed to elevate her legs for a couple of hours a day for several days every week would be unable to maintain a job.

Plaintiff provides insufficient argument and evidence to indicate that the ALJ's RFC assessment was inaccurate. None of the ALJ's hypotheticals contained this elevation restriction, and substantial evidence supports the ALJ's ultimate RFC assessment which does not contain an elevation restriction. Hypotheticals presented to the VE need not list the claimant's impairments, but they should provide the claimant's functional abilities. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010); *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). "The ALJ is not obliged to incorporate unsubstantiated complaints and restrictions in [her] hypothetical questions." *Turcus v. Soc. Sec. Admin.*, 110 F. App'x 630, 633 (6th Cir. 2004);

---

[21] Plaintiff's memorandum cited to pages 317-320 of the record. (DE 17, p. 9). It appears that these pages consist of Dr. Pharris' treatment notes. The Magistrate Judge assumes that Plaintiff intended to refer to Dr. Gore's records in the nearby pages.

*Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994). These hypotheticals are only required to include "those limitations which the ALJ has accepted as credible." *Infantado v. Astrue*, 263 F. App'x 469, 476–77 (6th Cir. 2008) (citing *Griffeth v. Comm'r of Social Sec.*, 217 Fed. App'x. 425, 429 (6th Cir. 2007) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). The ALJ's RFC assessment provides a thorough analysis of Plaintiff's treatment records from numerous medical providers, none of whom appear to have advised Plaintiff to elevate her legs.

Additionally, at the time Dr. Gore noted that Plaintiff's impairments improved with elevation, December 28, 2010, and January 13, 2011, he was not a treating source since those were his first and second appointments with Plaintiff. *See* 20 C.F.R. § 404.1502 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)."). Whether a physician's opinion is that of a treating source is determined "at the time he rendered his opinion." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006) (emphasis removed). When the claimed impairment would normally entail receiving frequent treatment, a physician is generally not a treating source during the first or second appointment. *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 491 (6th Cir. 2005) (finding that a physician was not a treating source when the claimant had only seen the physician twice and had sought further treatment from other sources on many occasions). Plaintiff saw numerous

physicians over the span of several years regarding her leg impairments. Dr. Gore's opinions from December 28, 2010 and January 13, 2011 are therefore not those from a treating source.

Further still, although Dr. Gore noted that Plaintiff's symptoms improved with elevation, the records provided do not state the frequency or length of elevation periods needed. (DE 14, pp. 312-316). Nor does Dr. Gore suggest Plaintiff continue elevating her legs in his "assessment/plan" section of the medical records. (DE 14, pp. 312-316). Additionally, the ALJ pointed out, Plaintiff saw Dr. Pharris in November 2010, and he "noted that she had no pain while sitting." (DE 14, p. 19, 320). The ALJ's RFC assessment, providing no leg elevation restrictions, is supported by substantial evidence, and Plaintiff's claim of error is without merit.

## IV. RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record (DE 16) be **DENIED** and the Commissioner's decision be **AFFIRMED**.

Within fourteen (14) days from receipt of this Report and Recommendation, the parties may serve and file written objections to the findings and recommendations made herein. Fed. R. Civ. P. 72(b)(2). Parties opposing the objections must respond within fourteen (14) days from service of these objections. *Id.* Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 1111 (1986).

**ENTERED** the 15th day of July, 2014,

/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge